IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| RICHARD FRANK D'ANTONIO, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Case No. 3:13-cv-0355 |
| | ) | |
| WAYNE CARPENTER, | ) | Judge Sharp |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION

Petitioner Richard Frank D'Antonio, a prisoner in state custody who is currently incarcerated at the Turney Center Industrial Complex, has filed a *pro se* petition under 28 U.S.C. § 2254 for a writ of habeas corpus (ECF No. 1) and, with the Court's permission, an amended petition (ECF No. 20). The respondent has filed an answer in opposition to the petition (ECF No. 23), along with a complete copy of the underlying state-court record. After being granted leave to do so, the petitioner filed a reply brief (ECF No. 36). Thereafter, the Court directed both parties to supplement their pleadings in light of the Sixth Circuit's decision in *Sutton v. Carpenter*, 745 F.3d 787 (6th Cir. March 19, 2014), *cert. denied*, 134 S. Ct. 1889 (April 21, 2014). (*See* ECF Nos. 40, 42.) The petition is ripe for review, and this Court has jurisdiction. 28 U.S.C. § 2241(d). For the reasons set forth herein, the petition will be denied and this action dismissed.

## I.    PROCEDURAL BACKGROUND

On September 25, 2003, petitioner Richard Frank D'Antonio was found guilty by a Davidson County jury on one count of first-degree murder and one count of assault with intent to commit murder. (ECF No. ECF No. 15-1, at 65 (criminal court minutes).) The trial court granted the petitioner's motion for judgment of acquittal as to count two, assault with intent to commit murder, on statute-of-limitation grounds, but denied the petitioner's motion for a new trial. (ECF No. 15-1, at 77.) Judgment was entered against D'Antonio on the murder charge, and he was sentenced to life imprisonment with the possibility of parole. (ECF No. 15-1, at 67.) The conviction and sentence were affirmed on direct appeal. *State v. D'Antonio* ("*D'Antonio I*"), No. M2003-03052-CCA-R3-CD, 2005 WL 2874657 (Tenn. Ct. Crim. App. March

9, 2005), *perm app. denied* (Tenn. May 1, 2006).

On November 15, 2006, the petitioner filed a lengthy *pro se* post-conviction petition and supporting memorandum in the state court. (ECF No. 15-3, at 29–145.) After the appointment of counsel, an amended petition was filed on November 17, 2008. (ECF No. 15-14, at 11–20.) The trial court conducted a hearing on April 19, 2011, and thereafter entered an order denying the petition. (ECF No. 15-14, at 29–47.) That decision was affirmed. *D'Antonio v. State* ("*D'Antonio II*"), No. M2011-01378-CCA-R3-PC, 2012 WL 2411871 (Tenn. Ct. Crim. App. June 27, 2012), *perm. app. denied* (Tenn. September 19, 2012). The petitioner filed his § 2254 petition in this Court on April 8, 2013 (ECF No. 1, at 25 (petitioner's oath as to the date the petition was placed in the prison mailing system)). The petition is timely, and this Court has jurisdiction.

## II. STATEMENT OF FACTS

The Tennessee Court of Criminal Appeals summarized the testimony presented during trial as follows:[1]

> At the time of his death, the victim [Kevin Hughes] was Chart Director for Cashbox magazine. The victim was hired for this position by the defendant in 1987. The defendant, in 1987, was the Division Manager at Cashbox but was not employed there at the time of the victim's death.
>
> Sharon Pennington, a record promoter for Step One Records in March of 1989, testified that she and the victim were good friends. She stated that they had attended a movie on March 9, 1989, and that she dropped the victim off at his office in the early evening. She said the victim was uncharacteristically "nervous" and "fidgety" that day.
>
> Ms. Pennington said that the Cashbox chart for independent artists was not legitimate and that the victim had been taking steps to make it legitimate and improve its image. She said that Chuck Dixon's control over the independent artists chart at Cashbox was so widely known that the magazine was often derisively called "Chuckbox" by members of the music industry. Ms. Pennington knew Chuck Dixon from her company having hired him as an independent record promoter. She knew the defendant due to his work at Cashbox and he was often with Dixon at meetings with her employers. She recalled that the defendant had a back injury at that time.
>
> On the day of the victim's death, Ms. Pennington had received two angry phone calls from Dixon asking her to relay messages to the victim. Dixon wanted the victim to restore some stations that had been dropped from those used to compile the charts. She explained that starter or smaller radio stations have a larger play list, making it easier for a promoter to obtain play for particular songs. The victim had dropped several smaller

---

[1] The factual findings of the state appellate court are presumed to be correct. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

stations in favor of stations with larger listening markets. This caused problems for Dixon in manipulating the selection of songs to be played. After she told the victim about Dixon's calls and that Dixon was upset, the victim responded that he expected Dixon to be upset.

Sammy Sadler was, in March 1989, promoting and recording for Evergreen Records. His promoter was Chuck Dixon. Sadler and the victim were "acquaintances and becoming friends." Sadler met the victim at the Cashbox office on March 9, 1989, and the two went out to eat and then went to Sadler's office at Evergreen Records. The two men left and went to the victim's car which was parked on Sixteenth Avenue South. As Sadler was entering on the passenger side, a man, wearing gloves and a mask and displaying a gun, appeared at Sadler's door. Sadler threw up his arms to protect his head and was shot once. Sadler did not recall making his way to a nearby apartment for assistance. Sergeant Kenny Dyer questioned Sadler that night, and Sadler reported that the assailant was wearing all black clothing and a ski mask. Sadler also thought the assailant was a black male of slender build.

On the night of the murder, two Belmont students witnessed the incident. Robert Lyons, III, was driving down 16th Avenue South; his passenger was Allison Kidd (now Chimento). Lyons witnessed the victim roll out of his car and start running. A man came from the other side of the victim's car and started pursuing the victim, shooting two or three times. The victim fell, and the assailant ran to him and shot the victim three more times. Lyons stated that the shooter had on a black ski mask, black clothing, and held in his right hand a blue-steel revolver. He estimated that the shooter was 5′10″ to 6′ tall and had a stocky build. Lyons stated that the eye holes in the shooter's mask were large enough for him to see that the shooter was Caucasian. He described the shooter as running with an unusual side-to-side gait. The police responded to a call of a shooting within three minutes.

Allison Kidd Chimento recalled driving down Music Row on March 9th with Bob Lyons a little after 10:00 p.m. when two men ran in front of their car. One man was fleeing from a man dressed in black and a ski mask, carrying a black gun in his right hand. She saw the shooter stand over the fallen victim and fire repeated shots. Mrs. Chimento said the assailant was from 5′9″ to 6′ tall and overweight in the mid-section. The shooter fled between buildings to the east.

On March 9, 1989, Phillip Barnhart lived in an apartment on Sixteenth Avenue South. He heard shots and looked out his window where he saw two men running down the street in a "zigzagged" fashion until they ran out of his vision. Barnhart thought one man was wearing a ski mask. Sammy Sadler was able to come to Barnhart's apartment, where he collapsed.

Donnie Lowery was in his apartment on Sixteenth Avenue South on the night of the victim's murder. He heard gunshots and looked out his window. He witnessed a man chasing and shooting at another man. When the victim fell, the shooter went to the body and shot another two or three times. The man was shooting with his right hand and, when he ran off, it was with an "abnormal gait," "somewhat like a limp." He said the shooter was 5′10″ to 6′ tall and had a "stocky build."

Kathy Hunter was visiting Lowery at the time of the shooting. She saw a man running and yelling, being pursued by a man dressed in black. When the victim fell, his pursuer walked up and shot him two or three more times. She stated the assailant was wearing a ball cap, as well as a ski mask. She estimated the assailant's height as 5′10″ to 6′ and said he was "stocky built."

Officer Charles Anglin, an employee in the Identification Division of Metro

Nashville Police Department, was one of the officers who gathered evidence at the scene. Among the items found were a spent projectile found near the victim's head and a ball cap near the victim's right foot. A hair found in the ball cap was submitted to the FBI for analysis. Agent Douglas Deedrick, a hair and fiber expert, testified that the black hair had characteristics of cat hair.

Detective Pat Postiglione interviewed the defendant on March 28, 1989. He described the defendant as cooperative but nervous. The defendant appeared to be in discomfort and complained of back problems. Detective Postiglione observed that the defendant was heavier in March of 1989 than at the trial.

Detective Bill Pridemore was the lead investigator of the victim's murder in 1989. He stated that two projectiles were removed from the victim's body during the autopsy. Those, together with the projectile found at the scene, were submitted for testing, as was a baseball cap found at the scene.

In February of 1993, Detective Pridemore learned that an individual named Steve Daniel had sold the defendant a handgun in 1989. Detective Pridemore interviewed Mr. Daniel and was provided with four spent bullets and one live round of ammunition which Daniel said was similar to that supplied the defendant when the defendant bought the gun. It was Detective Pridemore's understanding that the ammunition was obtained by Daniel after the defendant had purchased the gun.

By April of 2002, Detective Pridemore had been assigned to the cold case files within the Metro Nashville Police Department and was again working on this case. He contacted Steve Daniel and learned that the gun sold to the defendant had been test fired at Daniel's home on March 9, 1989, the day of the defendant's purchase. Detective Pridemore went to the scene of the test firing in Flintstone, Georgia and there recovered thirteen projectiles that were embedded in the ground. These were submitted to the TBI for testing.

In July of 2002, Detective Pridemore went to Las Vegas, Nevada, to escort the defendant back to Nashville after his arrest. The defendant made a statement when he was informed of the murder charge, that it must be about Kevin. At a later date, after the defendant's transfer back to Nashville, the defendant told Detective Pridemore that he would talk to him about the case if Pridemore could arrange for him to be housed in a private cell.

Detective Pridemore stated that he had measured the defendant in stocking feet and that he was 5′11″ tall. He also testified that Chuck Dixon had died in 2001.

TBI Special Agent Tommy Heflin testified as an expert in firearms and ammunition analysis. He stated that the two projectiles removed from the victim's body and the third projectile found at the crime scene were all fired from the same weapon. He identified them as .38 caliber, .357 size wad-cutter lead projectiles, and most probably were reloads. Agent Heflin also examined the thirteen projectiles found at Flintstone, Georgia. Of those, he concluded that one was fired from the same gun barrel that was used to shoot Kevin Hughes. That projectile was also a lead wad-cutter.

Dr. Mona Gretzel Case Harlan-Stevens, a forensic pathologist, performed the autopsy of the victim. She testified that four separate bullets struck the victim's body, and two were recovered. The cause of death was a gunshot wound to the head, and the manner of death was homicide.

Steven Daniel, a convicted marijuana dealer, began cooperating with Georgia and federal officers and became known to the Nashville police. He testified that he had

known the defendant since 1985 or 1986 and that they visited in each other's homes. The defendant was at Daniel's home in Flintstone, Georgia on March 9, 1989. Daniel said the defendant arrived unannounced in mid-afternoon and wanted to buy a pistol. Daniel sold the defendant a thirty-eight (.38) pistol and provided reloaded thirty-eight (.38) caliber bullets with the gun. The two men test fired the gun behind Daniel's house. The defendant left Daniel's house between 6:15 and 7:00 p.m. (CST).

Daniel stated that he remembered the date due to the defendant bringing it up in conversation several times later, as well as the defendant's then wife, Carolyn, having made inquiries about that evening. The defendant told Daniel to tell Carolyn that he had not left Daniel's home until after the 11:00 p.m. (EST) news that night. According to Daniel, the drive from his home in Flintstone to Nashville takes about two hours and fifteen minutes.

In 1993, Daniel reported to Georgia authorities that he might have information about a murder case. Daniel had seen a television program on Crime Stoppers concerning Kevin Hughes' murder. The program made reference to the assailant's strange running gait. Daniel had witnessed the defendant run and described it as "a real strange gait . . . more like an animal would run than a person."

At the request of the police, Daniel recorded phone conversations with the defendant. In one conversation, the defendant makes reference to renewed police interest in "when that boy got killed up here . . . out on Music Row" and requests Daniel to say, if asked, that the defendant left Daniel's house after the 11:15 (EST) news that night. Daniel stated that the defendant brought up this date three or four different times in their various conversations. When Daniel asked about the gun he had sold the defendant, the defendant said, "it's gone." Daniel stated that he cooperated with the Nashville detectives when contacted again in 2002 and that he showed them the area where he had test fired weapons at his former home in Flintstone.

Gene Kennedy testified that he had been promoting and producing records for twenty-eight years. He stated that he had, until about 1988, promoted to Cashbox magazine. Kennedy was approached by Chuck Dixon, who offered to promote to Cashbox for him in return for a fee of $1500 and a purchase of an ad in Cashbox by Kennedy. Kennedy refused and, for a period of two and one-half to three years, Kennedy's promoted records did not appear on the Cashbox charts. Kennedy believed that, in 1989, the Cashbox charts were controlled by Dixon and the defendant and that the charts lacked legitimacy. Kennedy had lunch with the victim a week before the victim's death and said the victim was acting "very nervous." On cross-examination, it was established that some records promoted by Kennedy in 1989 were charted in Cashbox. He claimed to have no knowledge of this as he had quit following the Cashbox charts.

Tom McEntee served as Division Manager of Cashbox from November of 1985 to April of 1987. He had hired the defendant to assist with the charts. When McEntee left Cashbox, the defendant took his place. McEntee said the defendant was friends with Chuck Dixon and had gone to work with Dixon when the defendant left Cashbox in 1988 or 1989. McEntee explained that charts could be manipulated either by false reporting from radio stations controlled by an interested person, *e.g.*, a promoter, pocket stations, or could simply be altered by the person compiling the charts.

Robert Metzger testified pursuant to a use immunity agreement with the district attorney. He had worked as a producer and promoter since 1971. He testified that, in the late 1980's, Cashbox's chart was the only exposure independent artists had in the Nashville music community. He said that the defendant was then in charge of Cashbox. In order to have a song charted, it was required that you hire Chuck Dixon and buy an ad

in Cashbox. Initially, Metzger's clients paid the defendant this fee, although Metzger was aware Dixon received part of the money. The minimum amount of money for six or seven weeks on the chart was $2500. Metzger illustrated the illegitimacy of the system by recounting that after a payment by his client, there was a problem with manufacturing the record. Nevertheless, the record, "Gal from San Antone," appeared on the Cashbox chart before a single copy was available for play or sale.

Metzger had seen the victim at a radio seminar shortly before the murder. There he observed the victim and Chuck Dixon having a heated argument. Metzger was unable to hear the words exchanged but said that Dixon was trying to give the victim money and that the victim repeatedly refused to accept it. After this incident, Metzger had a meeting with the defendant and Chuck Dixon. One of Metzger's artists was about to release two more records and was preparing to pay $15,000 to have the records charted and to keep them charted for an extended time. Metzger expressed his concerns to Dixon in the following manner:

> Metzger: I told him, I said, Chuck, you know, I saw you and Kevin having this big argument out at the Radio Seminar. And I said, you know, he's already dropped some of your pocket stations, which weakens your ability to keep a record in for a long time. And I know he's about to drop a bunch more of your pocket stations. And I said, Chuck, I'm not going to, you know, give you this fifteen thousand dollars unless I know for a fact you can handle Kevin Hughes.

> Assistant DA: Did you also explain to him something that you had heard?

> Metzger: I did, General. I said, you know, the rumor is all over Music Row is that Kevin is going to go to the media and expose this chart fixing scheme you guys are working at Cashbox. And I said, you know, if he does that, you know, this is going to look very bad on me and my clients and everybody involved in this.

Dixon responded that he was aware of the rumor and said, "I will handle Kevin Hughes. And if I, you know, can't handle him, he'll be gone." The defendant was present during this conversation. Upon receiving those assurances, the $15,000 was paid, plus an advertisement taken in Cashbox magazine. In return, the artist's release was the highest charted independent record, and he was named Cashbox Male Vocalist of the Year. Metzger clarified that the defendant was not employed at Cashbox during the time of the foregoing conversation but that he had become partners with Chuck Dixon.

Steve Hess was hired at Cashbox by Chuck Dixon as an assistant chart director a few weeks before the victim's death. After the victim's death, Hess assumed the duties of chart director and was trained by the defendant. Hess did not know whether Dixon was employed by Cashbox, but the owner of the magazine, George Albert, had made it clear that Dixon was in charge. Dixon did not maintain an office at the Cashbox site but was frequently in the Cashbox office. Hess was not instructed to manipulate the charts and, to his knowledge, they were compiled legitimately during his tenure.

Gary Bradshaw worked as a music promoter in 1989. He had known the victim, and the victim had expressed his dissatisfaction with his job at Cashbox and an intent to leave his job. About three months after the victim's death, Bradshaw was contacted by Chuck Dixon and agreed to work with him. He learned that the Cashbox charts were illegitimate. A chart position could be acquired by hiring Chuck Dixon for $1500 to $2000 and by paying Cashbox for an advertisement costing $750. Bradshaw testified that Dixon had control over the reporting of over half the 125 stations that reported to Cashbox. Those controlled were known as pocket stations.

The defendant was working for Dixon when Bradshaw came to work at Cashbox, but Bradshaw was unaware of any duties performed by the defendant. Bradshaw stated that when Dixon would become angry with someone, he would comment that their fate could be the same as Kevin's. Bradshaw stated that he saw firearms in the Cashbox office and that Dixon carried a weapon. The first time Bradshaw met Dixon, two of Dixon's "henchmen" frisked Bradshaw.

Sharon Corbett worked in the same building which housed Cashbox in 1989 and was a good friend of the victim. She testified that the victim had become unhappy with his job and was thinking of resigning. She also knew the defendant and said that he favored his hip to the point it was noticeable when he walked.

Cecilia Bragg was hired as a receptionist at Cashbox in 1987. She knew the victim, Chuck Dixon, and the defendant. She said that Dixon came to Cashbox regularly. She noted that the defendant had a bad back and limped. Immediately before the victim's murder, she said the victim seemed to be concerned and upset.

Sandra Daens worked at Cashbox in May of 1987. She had overheard the defendant tell others that chart positions could be acquired for the price of an advertisement in the magazine. She said Chuck Dixon was a frequent visitor with the defendant at Cashbox. She was fired by the defendant in September of 1987.

Mara Langlois, an investigator with the Davidson County District Attorney's office, served a search warrant at the home of Chuck Dixon in January of 2001. Two payment books containing names and dollar amounts were seized. One book's entries began in 1987 and ended in 1988 (orange book). Another book's entries began in 1990 and ended in 2000 (red book). No records were recovered from the period from October 1988 through 1989. The total amount of the payments in 1988 was $138,757.09. There were five payments from the defendant in 1988, totaling $3499. No payments from the defendant were reflected after 1988. The 1990 payment total was $295,796.97, and the total for 1990 through 2000 was $2,188,787.05. Dixon's rolodex contained the defendant's Las Vegas telephone number.

Carolyn Cox had been married to the defendant from 1986 until July of 1989. She testified that the defendant earned $13,000 per year when employed at Cashbox. After leaving, the defendant started an artist development business and worked with Chuck Dixon. After leaving Cashbox, the defendant acquired two houses, three cars, a grand piano, and a motorcycle.

Ms. Cox stated that on March 9, 1989, the defendant was not at home when she went to bed between eleven p.m. and twelve o'clock midnight. She was awakened by a phone call from Chuck Dixon at 3:00 a.m. She told Dixon that the defendant was not at home. After she had hung up the phone, the defendant appeared and asked who had called. The defendant told her he had been at Steve Daniel's house. Later, the defendant instructed her to tell police investigators that he was at home on the night of the victim's murder. Ms. Cox stated that during their marriage, the defendant suffered from a hiatal hernia and a bad back. She also said that they owned a black cat in 1989. She further testified that the defendant was right-handed.

*D'Antonio I*, 2005 WL 2874657, at *1–7.

## III.  ISSUES PRESENTED FOR REVIEW

In his habeas petition in this Court, Richard Frank D'Antonio asserts ten "grounds" for relief, most

of which encompass more than one claim. The Court construes the petition as setting forth twenty-seven

separate claims for relief, as follows:

1.      That the state of Tennessee lacked jurisdiction to arrest and try the petitioner (Ground One);

2.      That the petitioner's arrest in Las Vegas constituted an illegal seizure in violation of the Fourth and Fourteenth Amendments (Ground Two);

3.      That the petitioner's Fifth Amendment *Miranda* rights were violated when the trial court refused to suppress statements made after his arrest and prior to a *Miranda* warning (Ground Two);

4.      That the petitioner's constitutional rights were violated by the state of Tennessee's failure to apprise the petitioner of the exact charges against him in the indictment (Ground Three);

5.      That the state committed a *Brady* violation by suppressing news media reports and video footage of the petitioner's arrest in Nevada (Ground Four);

6.      That the state committed prosecutorial misconduct, "specifically by and through the actions of Assistant District Attorney Tom Thurman and Davidson County Metropolitan Police Detectives Bill Pridemore and Pat Postiglione" (Habeas Petition, ECF No. 1, at 13) at the time of the arrest in Nevada (Grounds Two and Five);

7.      That the petitioner received ineffective assistance of trial counsel based on trial counsel's failure to mount a defense based on the state's lack of jurisdiction (Ground Six);

8.      That the petitioner received ineffective assistance of trial counsel based on trial counsel's failure to assert a defense based on the illegal search and seizure that violated the Fourth Amendment (Ground Six);

9.      That the petitioner received ineffective assistance of trial counsel based on trial counsel's failure to mount a defense based on the "faulty indictment" (ECF No. 1, at 15) (Ground Six);

10.     That the petitioner received ineffective assistance of trial counsel based on trial counsel's failure to assert the *Brady* violations as a defense (Ground Six)

11.     That the petitioner received ineffective assistance of trial counsel based on trial counsel's failure or refusal to obtain a bond hearing or the petitioner's release on bond (Ground Six):

12.     That the petitioner received ineffective assistance of trial counsel based on trial counsel's refusal to call "key and crucial" witnesses, as discussed in the petitioner's *pro se* initial post-conviction brief in the state trial court (*citing* state pet'n for post-conviction relief at 107–09 (ECF No. 15-3, at 135–38)) (Ground Six);[2]

13.     That the petitioner received ineffective assistance of trial counsel based

---

[2] The respondent overlooked this claim and failed to address it in his answer to the petition. The claim appears in the petitioner's original habeas petition under Ground Six (ECF No. 1, at 13), articulated as a failure to "make any attempts to call any witnesses especially those listed on pages 107-109 of Mr. D'Antonio's petition for Post-Conviction relief all of whom were key and crucial to Mr. D'Antonio's defense." (*Id.*)

on trial counsel's failure to investigate possible alternative suspects (Ground Six);

14. That the petitioner received ineffective assistance of appellate counsel based on counsel's failure to raise claims (1), (2), (4), and (6) on direct appeal, resulting in a waiver of these issues (*see* Petition, Ground Six (ECF No. 1, at 15), cross-referencing state trial court's order denying post-conviction relief (Order at 16–17, ECF No. 15-14, at 44–45));

15. That the petitioner's rights under the Confrontation Clause were violated by the trial court's allowing the introduction of hearsay statements and "nonverbal hearsay statements" by the deceased victim (Ground Seven) (ECF No. 1, at 16);

16. That the trial court erred in admitting hearsay statements by deceased co-conspirator Chuck Dixon, in violation of the petitioner's due process and other constitutional rights (Ground Eight);

17. That the trial court erred in refusing to allow the petitioner to present rebuttal witnesses regarding Chuck Dixon's activities, in violation of the petitioner's due process and other constitutional rights (Ground Eight);

18. That the petitioner received ineffective assistance of counsel based on trial counsel's failure to call witnesses to rebut the testimony of the state's witnesses (Ground Eight);

19. That the trial court erred in admitting testimony from the state's witnesses concerning the activities of Chuck Dixon, in violation of the petitioner's due process and other constitutional rights (Ground Nine);

20. That the petitioner received ineffective assistance of counsel based on trial counsel's failure to object to the admission of testimony by Robert Metzgar and other witnesses concerning Chuck Dixon's business practices (Ground Nine);

21. That the petitioner received ineffective assistance of counsel based on trial counsel's failure to present rebuttal evidence as to Chuck Dixon's activities (Ground Nine);

22. That trial counsel was ineffective for failing to call "Lori," the petitioner's former housekeeper/nanny, as an alibi witness (Ground Nine);

23. That post-conviction counsel was ineffective for failing to locate witnesses (Ground Ten);

24. That post-conviction counsel was ineffective for failing to hire an investigator and failing to locate the witnesses listed in the petitioner's *pro se* post-conviction petition (Ground Ten);

25. That post-conviction counsel was ineffective for failing to incorporate all the issues raised at the post-conviction hearing in his appellate brief (Ground Ten);

26. That post-conviction counsel was ineffective for failing to submit all the necessary parts of the record in support of the petitioner's claims (Ground Ten); and

27. That post-conviction counsel was ineffective for failing to provide the petitioner a copy of the post-conviction hearing transcript in a timely manner (Ground Ten).

IV.     DISCUSSION AND ANALYSIS: DEFAULTED OR UNEXHAUSTED CLAIMS

A.     Standard of Review – Defaulted Claims

Generally, a federal district court will not entertain a petition for writ of habeas corpus unless the petitioner has first exhausted all available state-court remedies for each claim in his petition. 28 U.S.C. § 2254(b)(1). While exhaustion is not a jurisdictional requirement, it is a strictly enforced doctrine which promotes comity between the states and the federal government by giving the state an initial opportunity to pass upon and correct alleged violations of its prisoners' federal rights. *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). Consequently, as a condition precedent to seeking federal habeas corpus relief, the petitioner is required to fairly present his claims to every available level of the state court system. *Rose v. Lundy*, 455 U.S. 509, 518–20 (1982); *see also Duncan v. Henry*, 513 U.S. 364, 365–66 (1995) ("[A] federal habeas petitioner . . . [must] provide the state courts with a 'fair opportunity' to apply controlling legal principles to the facts bearing upon his constitutional claim."). Moreover, "the doctrine of exhaustion requires that a claim be presented to the state courts under the same theory in which it is later presented in federal court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998). Once his federal claims have been raised in the highest state court available,[3] the exhaustion requirement is satisfied, even if that court refused to consider the claims. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990).

A habeas petitioner bears the burden of demonstrating that he has properly and fully exhausted his available state court remedies with respect to the claims he presents for federal habeas review. *Prather v. Rees*, 822 F.2d 1418, 1420 n.3 (6th Cir. 1987) (citation omitted). If a habeas petitioner retains the right under state law to raise a claim by any available procedure, he has not exhausted that claim. 28 U.S.C. § 2254(c). Ordinarily, habeas petitions containing unexhausted claims are dismissed without prejudice in order to permit the petitioner the opportunity to pursue them in state court. *Alley v. Bell*, 307 F.3d 380, 385 (6th Cir. 2002) (citing *Rose*, 455 U.S. at 518, 520–22); *see also Rhines v. Weber*, 544 U.S. 269 (2005) (reconfirming the continued relevance of *Rose* under AEDPA)).

If, however, an unexhausted claim would be procedurally barred under state law, for instance by a statute of limitations or a state rule barring successive petitions, then the claim is deemed exhausted

---

[3] In Tennessee, review by the state Supreme Court is not required for exhaustion. Instead, "once the Court of Criminal Appeals has denied a claim of error, 'the litigant shall be deemed to have exhausted all available state remedies available for that claim.'" *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39).

(because no further state review is available) but procedurally defaulted (because it was not presented to a state court for review), and may not be considered by the federal court on habeas review except under extraordinary circumstances. *Alley*, 307 F.3d at 385–86 (citations omitted); *In re Cook*, 215 F.3d 606, 607–08 (6th Cir. 2000). Specifically, in order to obtain consideration of a claim that is procedurally defaulted, a petitioner must demonstrate both "cause" for the procedural default and actual prejudice resulting from the alleged constitutional errors. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)).

     *Coleman* also recognized that a prisoner can overcome a procedural default without showing cause and prejudice by "demonstrat[ing] that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. A fundamental miscarriage of justice results when one who is "actually" innocent is convicted. *Gibbs v. United States*, 655 F.3d 473, 477 (6th Cir. 2011). Actual innocence means factual innocence, not merely legal insufficiency. *Luster v. United States*, 168 F.3d 913, 915 (6th Cir. 1999). "Actual innocence" is an extremely narrow exception, and "claims of actual innocence are rarely successful." *Gibbs*, 655 F.3d at 477 (citing *Schlup v. Delo*, 513 U.S. 298 (1995)). Moreover, "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* (citing *Herrera v. Collins*, 506 U.S. 390 (1993)). Although the petitioner here clearly denies responsibility for the murder of which he was convicted and insists upon his actual innocence, he does not provide new, concrete evidence of actual innocence and therefore cannot overcome procedural default on this basis. *See Schlup*, 513 U.S. at 324 ("To be credible, such a claim [of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.").

     The petitioner here must therefore establish both cause and prejudice to overcome any procedural default. The "cause" standard generally requires a petitioner to show that "some objective factor external to the defense impeded counsel's efforts" to raise a claim in the state courts. *Wogenstahl v. Mitchell*, 668 F.3d 307, 321 (6th Cir. 2012) (quoting *McCleskey v. Zant*, 499 U.S. 467, 493 (1991) (internal quotation marks omitted)). Until recently, a prisoner could not demonstrate cause by claiming that he received ineffective assistance of counsel during state post-conviction proceedings. *See*

*Coleman*, 501 U.S. at 752–53 (holding that a post-conviction attorney's error is not cause to excuse a default). That barrier was based on the premise that an individual does not have a constitutional right to counsel in post-conviction proceedings, and therefore no right to the *effective* assistance of post-conviction counsel, so the prisoner himself "bear[s] the risk of attorney error that results in a procedural default." *Id.* (internal quotation marks omitted).

However, in *Martinez v. Ryan*, 566 U.S. ----, 132 S. Ct. 1309 (2012), the Supreme Court held that the ineffective assistance of post-conviction counsel can establish "cause" to excuse the procedural default of a defendant's substantial claim of ineffective assistance of counsel at trial, but only where state procedural law prohibits defendants from raising such claims on direct appeal and instead requires defendants to raise the claims for the first time in post-conviction proceedings. *Id.* at 1318–19. In *Trevino v. Thaler*, 569 U.S. ----, 133 S. Ct. 1911 (2013), the Court extended *Martinez* to apply to cases where, although state procedural law might permit defendants to raise ineffective-assistance claims on direct appeal, a state's "procedural framework, by reason of its design and operation, makes it highly unlikely in a typical case that a defendant will have a meaningful opportunity to raise a claim of ineffective assistance of trial counsel on direct appeal." *Id.* at 1921. Applying *Trevino*, the Sixth Circuit Court of Appeals recently held that "ineffective assistance of post-conviction counsel can establish cause to excuse a Tennessee defendant's procedural default of a substantial claim of ineffective assistance at trial." *Sutton v. Carpenter*, 745 F.3d 787, 795–96 (6th Cir. March 19, 2014) *cert. denied*, 134 S. Ct. 1889 (April 21, 2014).

The narrow exception to the procedural-default bar created by these cases requires both that the ineffective assistance of post-conviction counsel occur during the "initial-review collateral proceeding," *see Martinez*, 132 S. Ct. at 1320 ("The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts."), and that the claim be a "substantial" one. *See id.* at 1318–19 ("[T]he underlying ineffective-assistance-of-trial-counsel claim [must be] a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit"). In addition, *Martinez* did not dispense with the "actual prejudice" prong of the standard for overcoming procedural default first articulated by the Supreme Court in *Coleman*, 501 U.S. at 750.

Neither the Supreme Court nor the Sixth Circuit has yet provided guidance as to how district courts reviewing habeas petitions are to implement the ruling in *Martinez*. In one of the first circuit court opinions to address the issue directly, the Ninth Circuit held that, to establish that his claim is "substantial," a habeas petitioner must "show that his post-conviction relief counsel was ineffective under *Strickland v. Washington*." *Clabourne v. Ryan*, 745 F.3d 362, 376 (9th Cir. 2014). That is, the petitioner must show both that his post-conviction counsel's performance was constitutionally deficient and that the petitioner was prejudiced by the deficiency. Prejudice, under *Strickland*, requires showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the [post-conviction] proceeding would have been different." *Strickland*, 466 U.S. at 694. Further, according to the Ninth Circuit, "actual prejudice," for purposes of the *Coleman* analysis in the *Martinez* context, requires a showing that "the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the claim has some merit." *Clabourne*, 745 F.3d at 377 (quoting *Martinez*, 132 S. Ct. at 1318).

The *Clabourne* court recognized some "overlap" between the two prejudice requirements:

> Within the "cause" prong there is an element of "prejudice" that must be established: to show ineffective assistance of post-conviction relief counsel, a petitioner must establish a reasonable probability that the result of the post-conviction proceeding would have been different. The reasonable probability that the result of the post-conviction proceedings would have been different, absent deficient performance by post-conviction counsel, is necessarily connected to the strength of the argument that trial counsel's assistance was ineffective. The prejudice at issue is prejudice at the post-conviction relief level, but if the claim of ineffective assistance of trial counsel is implausible, then there could not be a reasonable probability that the result of post-conviction proceedings would have been different.

*Id.*

In other words, in many habeas cases seeking to overcome procedural default under *Martinez*, it will be more efficient for the reviewing court to consider in the first instance whether the alleged underlying ineffective assistance of counsel was "substantial" enough to satisfy the "actual prejudice" prong of *Coleman*. If not, because the "cause and prejudice" standard is conjunctive rather than disjunctive, the reviewing court would have no need to consider whether the petitioner has established cause to overcome the procedural default, in the form of ineffective assistance of post-conviction counsel.

With these principles in mind, the Court turns to the consideration of the petitioner's claims.

## B. Unexhausted and Defaulted Claims

The Court, having reviewed the entire underlying record, finds that, of the twenty-seven claims

identified above, those claims listed below were never presented, or were not presented under the same theory, to the Tennessee Court of Criminal Appeals, either on direct review or in the post-conviction proceedings, nor did the Tennessee Court of Criminal Appeals consider *sua sponte* any of these issues. Those claims marked with an asterisk were included in the petitioner's *pro se* post-conviction petition or in the amended petition filed by counsel in the state trial court, but were not included in the petitioner's post-conviction appellate brief:

*Claim 1, that the state lacked jurisdiction to arrest and try the petitioner;

*Claim 2, that the petitioner's arrest violated the Fourth Amendment;

*Claim 4, that the indictment was unconstitutionally vague in that it failed to provide notice of the state's conspiracy theory;

*Claim 5, that the state committed a *Brady* violation by suppressing new media reports and footage;

*Claim 6, that the state engaged in prosecutorial misconduct by illegally seizing the petitioner in Las Vegas;

Claim 7, that trial counsel was ineffective for failing to mount a defense based on the state's lack of jurisdiction;

Claim 8, that trial counsel was ineffective for failing to mount a defense based on the illegal seizure;[4]

*Claim 9, that trial counsel was ineffective for failing to mount a defense based on the faulty indictment, which did not charge conspiracy;

Claim 10, that trial counsel was ineffective for failing to object to *Brady* violations;

*Claim 11, that trial counsel was ineffective for failing to obtain a bond hearing;

*Claim 12, that trial counsel was ineffective for failing to call crucial witnesses;

Claim 14, that appellate counsel was ineffective for failing to raise claims 1, 2, 4, and 6 on appeal;

Claim 17, that the trial court erred in not allowing the petitioner to present rebuttal witnesses regarding Chuck Dixon's activities;

*Claim 18, that trial counsel was ineffective for failing to call rebuttal witnesses;

Claim 19, that the trial court erred in admitting testimony from the state's witnesses concerning the activities of Chuck Dixon, in violation of the petitioner's due process and other constitutional rights;

---

[4] The respondent asserts, repeatedly and incorrectly, that Claim 8 was raised in the petitioner's initial post-conviction brief at ECF No. 15-13, Page ID # 2038–41, 2060 (or ECF No. 15-13, at 107–10, 129). The Court has scoured the referenced pages and the petitioner's initial post-conviction brief in its entirety and cannot glean either an express or implied claim of ineffective assistance of counsel based on counsel's failure to mount a defense based on the allegedly illegal seizure of the petitioner.

Claim 20, that trial counsel was ineffective for failing to object to testimony about Chuck Dixon's activities;

*Claim 21, that trial counsel was ineffective for failing to present rebuttal evidence as to Dixon's activities;

Claim 22, that trial counsel was ineffective for failing to call "Lori" (housekeeper/nanny) as an alibi witness;

Claim 23, that post-conviction counsel was ineffective for failing to locate certain witnesses;

Claim 24, that post-conviction counsel was ineffective for ineffective for failing to hire an investigator and failing to locate the witnesses listed in the petitioner's *pro se* post-conviction petition;

Claim 25, that post-conviction counsel was ineffective for failing to incorporate all the issues raised at the post-conviction hearing in his appellate brief;

Claim 26, that post-conviction counsel was ineffective for failing to submit the complete record to support his claims on appeal; and

Claim 27, that post-conviction counsel was ineffective for failing to provide the petitioner a copy of the post-conviction hearing transcript in a timely manner.

For purposes of discussion, the claims in this list fall into three distinct categories: Claims 1, 2, 4, 5, 6, 17, and 19 are substantive claims of alleged trial court error; Claims 7, 8, 9, 10, 11, 12, 14, 18, 20, 21, and 22 are claims of ineffective assistance of trial or appellate counsel; and Claims 23, 24, 25, 26, and 27 are claims of ineffective assistance of post-conviction counsel during initial-review proceedings or in post-conviction appellate proceedings.

### 1.    *Claims 1, 2, 4, 5, 6, 17, and 19*

The first group consists of substantive claims of trial court error. As set forth above, the doctrine of exhaustion requires that a habeas claim for relief be raised at every available level of the state courts. *Manning v. Alexander*, 912 F.2d 878, 883 (6th Cir. 1990). In Tennessee, that means the claim must be presented to the Tennessee Court of Criminal Appeals. *Adams v. Holland*, 330 F.3d 398, 402 (6th Cir. 2003) (quoting Tenn. S. Ct. R. 39). Presenting a claim only at the trial court level does not satisfy the exhaustion requirement. In addition, to preserve a federal constitutional claim for habeas corpus, the legal and factual basis of the claim must be "fairly presented" to the state courts so that they have an opportunity to remedy the alleged constitutional violation. *Williams v. Anderson*, 460 F.3d 789, 806 (6th Cir. 2006). To be found to have fairly presented a claim in the state courts, a petitioner must have presented his claim to the state courts "under the same theory in which it is later presented in federal

court." *Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998).

Claims 1, 2, 4, 5, 6, and 17 were raised during initial post-conviction proceedings, but they were never presented to the Tennessee Court of Criminal Appeals. Regarding Claim 19, although the petitioner argued on direct appeal that the trial court erred in admitting testimony concerning the business and conduct of Chuck Dixon because this evidence violated the Tennessee Rules of Evidence, he did not argue that admission of the evidence violated his due-process and other federal constitutional rights, as he does now in this Court.

Although these claims remain technically unexhausted, because they were never presented to the state appellate court under a federal constitutional theory, the petitioner is barred by Tennessee's one-year statute of limitations, Tenn. Code Ann. § 40-30-102(a), and the state's one-petition rule, Tenn. Code Ann. § 40-30-102(c), from presenting any of the claims to the state courts now. He does not argue that any of the circumstances enumerated in Tenn. Code Ann. § 40-30-117(a) permit him to re-open his post-conviction petition in the Tennessee courts. The claims listed above are therefore considered to be exhausted (because no further state review is available) but procedurally defaulted (because they were never presented to the state courts), and may not be considered by the federal court on habeas review unless the petitioner demonstrates both cause for the procedural default and actual prejudice resulting from the alleged constitutional errors.[5]

The petitioner offers generally as "cause" for his default the ineffective assistance of his trial counsel in failing to raise these issues at trial, his appellate counsel's waiver of these issues by refusing to raise them on direct appeal, and his post-conviction counsel's failure to argue them in the post-conviction appeal. However, while constitutionally ineffective assistance of trial counsel may constitute cause to excuse a procedural default, *see Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Wogenstahl*, 668 F.3d at 321, counsel's allegedly constitutionally deficient performance cannot constitute cause here, because the petitioner did not exhaust his claims of ineffective assistance of counsel based on his trial or appellate counsel's failure to raise these substantive issues as independent claims in the state courts. As the Supreme Court has recognized, "ineffective assistance adequate to establish cause for the procedural

---

[5] As set forth above, the petitioner does not make a credible claim of actual innocence that would permit consideration of his claims, despite the default, on the basis that a failure to consider the claims would result in a "fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

default of some other constitutional claim is *itself* an independent constitutional claim." *Carpenter*, 529 U.S. at 451. Thus, in order for counsel's ineffectiveness in failing properly to preserve a claim for review in state court to establish cause, counsel's performance must actually amount to ineffective assistance of counsel under the Sixth Amendment. For this reason, the ineffective assistance claim which is asserted as cause must itself be exhausted and not procedurally defaulted. *Id.* at 452–53.

Here, the petitioner never presented any ineffective-assistance claims based on claims 1, 2, 4, 5, 6, 17, or 19 to the Tennessee Court of Criminal Appeals.[6] Such ineffective-assistance claims are therefore unexhausted and cannot be used as a basis to establish cause to overcome the procedural default of the substantive claims. *Cf. Lott v. Coyle*, 261 F.3d 594, 608–09 (6th Cir. 2001) ("Lott never presented the state courts with an opportunity to review his ineffective-assistance-of-appellate-counsel claim as cause for the default of his jurisdiction claim, and thus, is procedurally barred from making such an argument now." (citing *Murray v. Carrier*, 477 U.S. 478, 488–89 (1986)).

Moreover, the petitioner's express reliance upon *Martinez* does not help him overcome the procedural default as to these claims. The Court understands the petitioner to posit as "cause" for his default the failure of his post-conviction counsel to present these issues in the initial post-conviction proceeding (or to argue them on appeal), either substantively or as ineffective-assistance claims. The Sixth Circuit, however, has continued to reject claims based on such dual layers of alleged ineffectiveness, even under *Martinez*. In *Hodges v. Colson*, 727 F.3d 517 (6th Cir. 2013), the petitioner, like the petitioner here, attempted to rely on the ineffective assistance of his post-conviction counsel to establish cause to excuse the default of a substantive claim of juror misconduct. The court observed: "Hodges also cannot rely on ineffective assistance of post-conviction counsel to excuse the default. Hodges did not default an ineffective assistance of trial counsel claim; he defaulted his claim that he was not competent to stand trial. Accordingly, *Martinez v. Ryan* and *Trevino v. Thaler* are inapplicable and the *Coleman* rule [of default] still applies." *Hodges*, 727 F.3d at 540 (internal citations omitted).

In short, these claims are procedurally defaulted, and the petitioner has not established cause sufficient to overcome the default.

---

[6] As discussed below, the petitioner does raise Claims 1, 2, 4, and 5 as ineffective-assistance-of-trial-counsel claims in his present petition, as Claims 7, 8, 9, and 10.

**2.      Claims 7, 8, 9, 10, 11, 12, 14, 18, 20, 21, and 22**

These claims of ineffective assistance of trial and appellate counsel were not raised in the petitioner's post-conviction appeal, though several of them (Claims 9, 11, 12, 18 and 21) were presented in the petitioner's *pro se* post-conviction brief in the state trial court. The petitioner again asserts as "cause" for this default the ineffective assistance of his post-conviction counsel.

The Sixth Circuit has expressly held that the *Martinez* exception does not extend to situations in which a petitioner asserts the ineffective assistance of post-conviction counsel as cause for the default of a claim of ineffective assistance of *appellate* counsel, as opposed to trial counsel:

> The Court in *Martinez* purported to craft a narrow exception to *Coleman*. We will assume that the Supreme Court meant exactly what it wrote: "*Coleman* held that an attorney's negligence in a postconviction proceeding does not establish cause, and this remains true except as to initial-review collateral proceedings for claims of ineffective assistance of counsel *at trial*." [*Martinez*, 132 S. Ct.] at 1316 (emphasis added). . . . Under *Martinez*'s unambiguous holding our previous understanding of *Coleman* in this regard is still the law—ineffective assistance of post-conviction counsel cannot supply cause for procedural default of a claim of ineffective assistance of appellate counsel."

*Hodges*, 727 F.3d at 531. Claim 14, which is premised upon the ineffective assistance of appellate counsel, is defaulted, and the ineffective assistance of post-conviction counsel clearly may not serve as "cause" to overcome this default.

Similarly, *Martinez* does not extend to the ineffective assistance of post-conviction *appellate* counsel, because the exception pertains only to "initial-review collateral proceedings." *Martinez*, 132 S. Ct. at 1316. Consequently, the ineffective assistance of post-conviction counsel for failing to raise issues in the post-conviction appeal that were raised in the initial-review post-conviction proceedings cannot serve as cause to overcome the procedural default. The petitioner therefore cannot overcome the default of Claims 7, 9, 11, 12, 18 and 21, which were presented to and rejected by the trial court in initial-review post-conviction proceedings.

This leaves for consideration only the petitioner's claims that the ineffective assistance of post-conviction counsel serves as "cause" to overcome the procedural default of Claims 7, 8, 10, 20, and 22, which were not raised in initial-review collateral proceedings. The respondent argues generally that these claims[7] are not "substantial" and therefore do not satisfy the standard established by *Martinez* for

---

[7] As indicated in note 4, *supra*, the respondent mistakenly contends that Claim 8 was raised in initial-review post-conviction proceedings and therefore does not address Claim 8 in this context.

overcoming procedural default. As discussed above, the question of whether a claim is "substantial" under *Martinez* overlaps to a large extent with the inquiry under *Strickland* as to whether the petitioner was prejudiced by the alleged error, which in turn generally requires consideration of whether trial counsel was ineffective for failing to raise the particular claim.

### a. Claim 7

The petitioner asserts in this claim that his trial counsel was ineffective for failing to mount a defense based on the state's lack of jurisdiction. It is clear, however, that the petitioner's assertion that the state court lacked jurisdiction to arrest and try him has no legitimate legal foundation. The jurisdiction of a Tennessee circuit court is limited to crimes that occur within the territorial boundaries of the county in which the court sits. *State v. Hill*, 847 S.W.2d 544, 545 (Tenn. Ct. Crim. App. 1992) (citing Tenn. Const. art. I, § 9; *Harvey v. State*, 376 S.W.2d 497 (Tenn. 1964); *Norris v. State*, 155 S.W. 164 (Tenn. 1913)). There is no dispute in this case that the murder occurred in Davidson County and that the petitioner was indicted by a Davidson County grand jury and convicted by a petit jury in the Davidson County Criminal Court. Accordingly, trial counsel had no apparent basis for raising a defense premised on the trial court's lack of jurisdiction. In turn, post-conviction counsel's failure to raise an ineffective-assistance claim based on trial counsel's failure to raise a jurisdictional defense was not unreasonable, nor was the petitioner prejudiced thereby. The claim is insubstantial and does not merit relief.

### b. Claim 8

In Claim 8, the petitioner asserts that his trial counsel was ineffective for failing to mount a defense based on his allegedly unconstitutional arrest in Las Vegas, and that the ineffective assistance of post-conviction counsel constitutes cause to overcome the default of this claim. In support of his claim that his arrest violated the Fourth Amendment, the petitioner insists that he was arrested inside his home in Las Vegas with no arrest warrant and no indictment. (*See* ECF No. 1-1, at 1 (stating that detectives Bill Pridemore and Pat Postiglione, "with the aid of local authorities . . . went to the home of Richard F. D'Antonio and arrested him inside his home without warrants or any documentation whatever.") In his supplemental memorandum, the petitioner asserts that state prosecutor obtained the indictment after the petitioner was arrested. (ECF No. 42, at 7.)

The Fourth Amendment protects "the right of people to be secure in their persons, houses,

papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. A "seizure" of an individual takes place when, "by means of physical force or a show of authority, his freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). "It is a well-settled principle of constitutional jurisprudence that an arrest without probable cause constitutes an unreasonable seizure in violation of the Fourth Amendment." *Ingram v. City of Columbus*, 185 F.3d 579, 592–93 (6th Cir. 1999) (citation omitted). Conversely, it has also "long been settled that 'the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause for the purpose of holding the accused to answer.'" *Higgason v. Stephens*, 288 F.3d 868, 877 (6th Cir. 2002) (quoting *Ex parte United States*, 287 U.S. 241, 250 (1932)). Even in the absence of a warrant, probable cause to arrest exists where there are "'facts and circumstances within the [arresting] officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)).

In this case, as a factual matter, the record establishes that the indictment was filed on July 19, 2002. (ECF No. 15-1, at 5.) The petitioner was arrested on July 24, 2002, after the indictment had been issued. The petitioner does not contest the facial validity of the indictment or argue that the arresting officers lacked probable cause to arrest him. Regardless of whether the petitioner was presented with a copy of the indictment or even aware of its existence, the fact that the indictment had already been issued necessarily means that his arrest was based upon probable cause and therefore did not violate the Fourth Amendment. Because it appears that the arrest did not violate the Fourth Amendment, trial counsel was not ineffective for failing to raise this claim, and post-conviction counsel was not ineffective for failing to raise an ineffective-assistance-of-trial-counsel claim premised on this issue. This claim is without merit.

### c.  Claim 10

In this claim, the petitioner argues that his trial counsel was ineffective for failing to object to *Brady* violations and that the default of this claim was caused by the ineffective assistance of post-conviction counsel.

To establish a *Brady* claim, a petitioner must show that the state withheld exculpatory evidence material to either the petitioner's guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 87 (1963). The Supreme Court has articulated "three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Youngblood v. West Virginia*, 547 U.S. 867, 870 (2006) (citations and quotation marks omitted). "A reasonable probability is a probability sufficient to undermine confidence in the outcome" of the proceeding. *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (citations and quotation marks omitted). Importantly, *Brady* does not apply when the defendant "knew or should have known the essential facts permitting him to take advantage of any exculpatory information." *Coe v. Bell*, 161 F.3d 320, 344 (6th Cir. 1998). Similarly, *Brady* does not apply when the factual basis for the claim was readily available to the petitioner or his counsel from a publicly available source. *Bell v. Bell*, 512 F.3d 223, 235 (6th Cir. 2008).

The alleged basis for the *Brady* claim in this case is that:

> All film footage and broadcasting in the media was suppressed. This evidence would have shown to a jury that not only was Mr. D'Antonio illegally seized and arrested, but that upon presentation of this evidence Mr. D'Antonio was not a fugitive from justice as stated by Tom Thurman to bolster his case.

(ECF No. 1-1, at 1.) The Court finds that the petitioner's allegations fail to establish that the alleged suppression of the media video footage violated *Brady*, first because the petitioner himself and therefore his counsel either knew or should have known the essential facts permitting him to take advantage of whatever exculpatory evidence was contained in the footage. Second, the footage at issue was apparently publicly available. In any event, the petitioner has not established that it was actually in the possession of the state such that the state would have had a duty to disclose it. And finally, the petitioner has not shown how the footage would have had a reasonable probability of altering the outcome of trial.

In short, the petitioner cannot show that post-conviction counsel was ineffective for failing to raise this claim, and it does not provide a basis for relief.

### d. Claim 20

In this claim, the petitioner asserts that his trial counsel was ineffective for failing to object to

witness Robert Metzgar's testimony about Chuck Dixon's business practices and conduct at Cashbox. (ECF No. 1, at 17.) In actuality, defense counsel did object to the testimony of Robert Metzgar on the grounds that the testimony he sought to offer was not in furtherance of the alleged conspiracy (*see* Trial Tr. Vol. IV, at 459, ECF No. 15-5, at 31), but the trial court overruled the objection. Thus, the petitioner's claim that counsel was ineffective for failing to object to Metzgar's testimony fails as a factual matter, and it would have been frivolous for post-conviction counsel to argue that trial counsel was ineffective for failing to do something that he actually did. The petitioner is not entitled to relief on the basis of this claim.

### e.    Claim 22

Finally, the petitioner argues that trial counsel was ineffective for failing to call "Lori," former "housekeeper/nanny" as an alibi witness. He asserts that Lori would have been able to testify that

> she would bring him on a daily basis Monday through Friday his infant daughter Ana Marie to his office between 4:30 and 5:00PM so Mr. D'Antonio could drive to the eastern part of Mt. Juliet to pick up his pre-teenage son from fun-company his after school activity before 6:00PM. These facts would have let jurors know beyond <u>any</u> reasonable doubt that there was no way possible Mr. D'Antonio could have driven to North Georgia on that fatal day of March 9th, 1989 as alleged by the state's case-in-chief.

(ECF No. 1, at 20.)

The Court finds that if, in fact, a former nanny/housekeeper named Lori was available to testify and could have testified that on the particular day in question, the petitioner was in his office with his children between 4:30 and 5:00 p.m., this testimony might have had an impact on the outcome of the trial. However, in order to establish that post-conviction counsel was ineffective for failing to raise an ineffective-assistance-of-trial-counsel claim based on this evidence, the petitioner would need to show, at a minimum, that post-conviction counsel was aware of Lori's existence, that she was available to testify, and that she would corroborate the petitioner's claims. As the state points out, however, the petitioner submitted an exhaustive post-conviction petition in which he raised every issue he personally could think of, but he did not include any mention of an alibi or a nanny/housekeeper named Lori, despite the fact that his whereabouts on the day of the murder was an important issue in the case. Moreover, the petitioner, even now, does not assert that he mentioned this issue to his post-conviction counsel but that counsel refused or simply failed to include the issue in the amended petition or to amend the petition a second time, if necessary, to include the issue. Nor does the petitioner allege that Lori was available to testify to corroborate his claims.

Likewise, the petitioner does not suggest that he told his trial counsel about Lori and this potential alibi evidence but that his trial counsel refused or neglected to follow up on this witness. If trial counsel was unaware of Lori's existence, counsel could not have been negligent for failing to search for her to present her testimony.

Accordingly, although the Court finds this claim to be potentially "substantial" for purposes of *Martinez*, the Court further finds that the petitioner has not carried his burden of establishing any failure on the part of post-conviction counsel. He is not entitled to relief on the basis of this claim.

### 3.    *Non-Cognizable Claims—Claims 23 through 27*

Claims 23 through 27 (which comprise Ground Ten of the petition) are premised on the ineffective assistance of post-conviction counsel. The petitioner acknowledges that these claims were not raised in the state court, in any form, based on the fact that there are "No State Remedies" (ECF No. 1, at 22) for such claims. He asserts, however, that "the ineffectiveness of Post-Conviction counsel[] . . . has recently been recognized as a cognizable ground for relief by the United States Supreme Court." (*Id.* at 23.)

Because these claims were never presented to any other court, they are procedurally defaulted and on that basis not reviewable by this Court. Moreover, as indicated above, the petitioner is mistaken in believing that the Supreme Court has recognized a free-standing right to effective counsel in state post-conviction proceedings. In *Coleman v. Thompson*, the Court stated in no uncertain terms: "There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Coleman*, 501 U.S. at 752 (citations omitted). The Supreme Court's recent rulings in *Martinez* and *Trevino* did not relax or abrogate that part of *Coleman*'s holding. Thus, because the petitioner is not constitutionally guaranteed the assistance of counsel in post-conviction proceedings, he is not entitled to relief on the basis of the claims 23 through 27.

## V.    DISCUSSION AND ANALYSIS: FULLY EXHAUSTED CLAIMS

### A.    Standard of Review of Fully Exhausted Claims

Even when a petitioner's application for a writ of habeas corpus raises only federal constitutional claims that have been properly exhausted in the state courts, this Court's review of the state court's resolution of those issues remains quite limited. The standard for reviewing applications for the writ of

habeas corpus is set forth in 28 U.S.C. § 2254(d). This section states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

*Id.* In other words, a federal court is bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established federal law. *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Further, this Court must presume the correctness of state court factual determinations, and the petitioner has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *see also Cremeans v. Chapleau*, 62 F.3d 167, 169 (6th Cir. 1995) ("We give complete deference to state court findings unless they are clearly erroneous."), *abrogated on other grounds by Thompson v. Keohane*, 516 U.S. 99, 111 (1995).

The United States Supreme Court has explained the proper application of the "contrary to" clause as follows:

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . . A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [this Court's] precedent.

*Williams v. Taylor*, 529 U.S. 362, 405–06 (2000) (citation omitted).

With respect to the "unreasonable application" clause of § 2254(d)(1), the Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause when "a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Williams*, 529 U.S. at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> . . . . [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause,

then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409–11 (emphasis original).

With these principles in mind, the court will turn to the examination of the exhausted claims raised in D'Antonio's petition for habeas relief.

### B. Fully Exhausted Claims: 3, 13, 15, and 16

#### 1. Claim 3: Violation of the petitioner's Fifth Amendment rights

The petitioner argues that he was interrogated without the benefit of the warnings required by *Miranda v. Arizona*, 384 U.S. 436 (1966), and that admissions made during that interrogation were admitted at trial in violation of his rights under the Fifth Amendment. He moved in the trial court to suppress these statements (*see* ECF No. 15-1, at 29) and raised the issue on direct appeal. The respondent concedes that this issue is fully exhausted.

In the first statement he sought to suppress, the petitioner stated after he was informed of the charges against him that he knew the matter "had to be about Kevin." (*Id.*; *see also* Mot. to Suppress Hr'g Tr. at 124:23–24, ECF No. 15-2, at 145.) When Deputy District Attorney Thurman confronted the petitioner with alleged evidence of his guilt and informed him that Tennessee might seek the death penalty, the petitioner again stated that when he had heard the charge was for homicide, he "knew it had to be about Kevin." (*Id.* at 30.) The third statement occurred after the petitioner had been brought from Las Vegas to Nashville. According to the testimony of Detective Bill Pridemore, the detective escorted D'Antonio into the booking room in night court. The defendant inquired about whether he would receive his medication and where he would be housed. Detective Pridemore told him he would be in the "general population, most likely," unless he was placed in a medical ward. (Mot. to Suppress Hr'g Tr. at 128:3–6, ECF No. 15-2, at 149.) Shortly thereafter, the petitioner, again according to Pridemore, volunteered to the detective that he would be willing to discuss the case if the detective would get him a private cell.

The trial court, in considering the *Miranda* issue, found as a factual matter that the police officers and the deputy district attorney had simply advised the defendant of the charges against him and the possible range of punishment, and that Detective Pridemore had not been interrogating the petitioner at the time he volunteered that he would provide information in exchange for a private cell. On that basis the

court held that there was no Fifth Amendment or *Miranda* violation.

In addressing the *Miranda* issue, the Tennessee Court of Criminal Appeals articulated the governing federal legal standards and concluded, based on the facts as determined by the trial court, that the petitioner's rights had not been violated:

> The right against self-incrimination is protected both by the United States Constitution, Article V, and the Tennessee Constitution, Article I section 9. To protect these rights, certain procedural safeguards of advising an individual in custody before interrogation are required. *See Miranda v. Arizona*, 384 U.S. 436 (1966). Statements made during custodial interrogation without the benefit of *Miranda* warnings are inadmissible in court. *See Dickerson v. United States*, 530 U.S. 428 (2000). *Miranda* warnings are required only when the defendant is in custody and is subjected to questioning or its functional equivalent. *See Rhode Island v. Innis*, 446 U.S. 291 (1980). In *Innis*, the Supreme Court elaborated on "interrogation" for *Miranda* purposes:

> > "[I]nterrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they should have known were reasonably likely to elicit an incriminating response.

> *Id.* at 301–02 (footnotes omitted).

> . . . .

> The defendant's statement in this case was not directly responsive to the charges and were unforeseeable results of stating the crime charged and the possible range of punishment. The defendant's response is even subject to an innocent interpretation as opposed to being strictly incriminating. We agree with the trial court that under the totality of circumstances, the defendant was not justified in perceiving this explanation as an interrogation.

> The second statement by the defendant, which was sought to be suppressed, was made after the defendant's extradition to Nashville. Detective Pridemore was escorting the defendant into the booking room, and the defendant began making inquiries as to whether his medicines were available and where he would be housed in the jail. Detective Pridemore told the defendant that he would probably be housed in the general population. The defendant then said words to the effect of, "I'll tell you about the case if you'll give me a private room." Detective Pridemore responded that it was too late, and no further statements were made by the defendant.

> . . . .

It is undisputed that the defendant, at the time of this statement, was in custody and had invoked his right to counsel. Thus, our sole focus is to determine whether the statement in question was made in response to improper police interrogation.

The Supreme Court in *Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981), stated: "We further hold that an accused . . . , having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, *unless the accused himself initiates further communication, exchanges, or conversations with the police*." (emphasis added).

We agree with the trial court that the defendant's spontaneous offer to talk about the case in exchange for a private cell was neither initiated by the officer nor was it interrogation.

*D'Antonio*, 2005 WL 2874657, at *14–15.

The Tennessee Court of Criminal Appeals' determination of the facts in light of the evidence was not unreasonable. Moreover, the state court identified the correct legal principles, and its application of those principles to the facts in this case was not unreasonable or contrary to clearly established federal law. The petitioner is not entitled to relief on the basis of this claim.

### 2. Claim 13: Ineffective assistance of trial counsel based on failure to investigate possible alternative suspects

This claim is partially exhausted. In his post-conviction petition in the trial court, the petitioner argued that his trial counsel was ineffective for failing to investigate numerous potential alternative suspects, including, among others, Milton Reyes, Steve Daniel, and Kenneth Matthews. On appeal, however, his post-conviction counsel raised only the issue of trial counsel's failure to investigate Milton Reyes as a possible alternative suspect. To the extent the petitioner continues to claim that his trial counsel was ineffective for failing to consider and investigate other potential suspects, those claims are procedurally defaulted at the post-conviction appellate level, and the petitioner has not presented cause to overcome the procedural default, for the reasons discussed in connection with the other petitioner's other defaulted claims.

In considering this issue as it concerns Milton Reyes, the Tennessee Court of Criminal Appeals correctly articulated the governing federal standard as established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and concluded that the petitioner had not met this standard with regard to this particular claim:

The Petitioner contends that trial counsel provided ineffective assistance of counsel in failing to investigate Milton Reyes as an alternative suspect. . . .

*Vaughn* [*v. State*, 202 S.W.3d 106 (Tenn. 2006),] repeated well-settled principles applicable to claims of ineffective assistance of counsel:

> The right of a person accused of a crime to representation by counsel is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. Both the United States Supreme Court and this Court have recognized that this right to representation encompasses the right to reasonably effective assistance, that is, within the range of competence demanded of attorneys in criminal cases.

*Vaughn*, 202 S.W.3d at 116 (internal quotations and citations omitted).

In order to prevail on an ineffective assistance of counsel claim, the petitioner must establish that (1) his lawyer's performance was deficient and (2) the deficient performance prejudiced the defense. *Id.* (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn.1975)). "[A] failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim. Indeed, a court need not address the components in any particular order or even address both if the [petitioner] makes an insufficient showing of one component." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (citing *Strickland*, 466 U.S. at 697).

A petitioner successfully demonstrates deficient performance when the clear and convincing evidence proves that his attorney's conduct fell below "an objective standard of reasonableness under prevailing professional norms." *Id.* at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter*, 523 S.W.2d at 936). Prejudice arising therefrom is demonstrated once the petitioner establishes "'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* at 370 (quoting *Strickland*, 466 U.S. at 694).

We note that "[i]n evaluating an attorney's performance, a reviewing court must be highly deferential and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999) (citing *Strickland*, 466 U.S. at 689). Moreover, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89.

First, the Petitioner contends that trial counsel provided ineffective assistance of counsel in failing to investigate Milton Reyes as an alternative suspect. The Petitioner asserts that Reyes confessed to shooting two individuals on Music Row, which was "the crime for which [the Petitioner] was tried." However, as noted by the post-conviction court, the Petitioner failed to present Reyes or any other relevant witnesses at the hearing on his petition and "failed to produce sufficient evidence to establish the existence of [Reyes's] statement." This court has concluded that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). The presentation of the witness at the post-conviction hearing is the only way for the petitioner to establish:

> (a) a material witness existed and the witness could have been discovered but for counsel's neglect in his investigation of the case, (b) a known witness was not interviewed, (c) the failure to discover or interview a witness inured to his prejudice, or (d) the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice

of the petitioner.

*Id.* Accordingly, we conclude the record supports the post-conviction court's determination that the Petitioner failed to carry his burden of establishing the deficiency and prejudice prongs required to prevail on an ineffective assistance of counsel claim.

*D'Antonio II*, 2012 WL 2411871, at *13–14.

Federal habeas relief may not be granted under 28 U.S.C. § 2254 unless the petitioner shows that the earlier state court's decision "was contrary to" federal law then clearly established in the holdings of the United States Supreme Court, § 2254(d)(1); *Williams*, 529 U.S. at 412; or that it "involved an unreasonable application of" such law, § 2254(d)(1); or that it "was based on an unreasonable determination of the facts" in light of the record before the state court, § 2254(d)(2). Thus, when a claim of ineffective assistance of counsel is raised in a federal habeas petition, the question to be resolved is *not* whether the petitioner's counsel was ineffective. Rather, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. ----, 131 S. Ct. 770, 785 (2011). As the Supreme Court clarified in *Harrington*,

This is different from asking whether defense counsel's performance fell below *Strickland*'s standard. Were that the inquiry, the analysis would be no different than if, for example, this Court were adjudicating a *Strickland* claim on direct review of a criminal conviction in a United States district court. Under AEDPA, though, it is a necessary premise that the two questions are different. For purposes of § 2254(d)(1), an unreasonable application of federal law is different from an incorrect application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself.

*Harrington*, 131 S. Ct. at 786 (internal quotation marks and citation omitted).

The petitioner has not shown the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law," or that it "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d). Accordingly, the petitioner is not entitled to relief on the basis of this claim.

**3.      *Claim 15: Violation of the petitioner's rights under the Confrontation Clause by introduction of hearsay statements by the deceased victim***

In Claim 15, the petitioner contends that the state court's admission of several hearsay statements and "non-verbal" hearsay by the deceased victim, Kevin Hughes, violated his Sixth Amendment right to confront witnesses against him. He raised this issue in his direct appeal, arguing that the Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), "support[ed] a finding that

admission of the evidence at issue violated [the defendant's] Sixth Amendment right to confront witnesses against him." (Dir. App. Br. at 40, ECF No. 15-12, at 48.) He characterized *Crawford* as holding that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity to cross-examine." (*Id.* (quoting *Crawford*, 124 S. Ct. at 1374).) Without addressing whether the testimony at issue was "testimonial," he argued that *Crawford* applied in this case because the statements in question were never subject to a prior opportunity to cross-examine.

The statements at issue included testimony from various witnesses that "the victim was thinking of quitting his job at Cashbox, that he was feeling a lot of pressure, and that he was unhappy and wanted to visit his parents"; that the victim had "talked about going back home and . . . had enough of Cashbox"; that he "seemed nervous and almost scared" and in a telephone call to his brother the evening he was murdered, told his brother he loved him, which was unusual; that he appeared to be "intimidated" by Chuck Dixon; and that he had "expressed suspicion that the Cashbox charts were being changed in his absence." *State v. D'Antonio*, 2005 WL 2874657, at *16.

The state appellate court succinctly rejected the defendant's argument that this testimony violated the Confrontation Clause: "We do not believe *Crawford* to be applicable to the instant testimony. The holding therein forbade testimonial evidence unless the declarant was unavailable and there had been a prior opportunity to cross-examine. We do not characterize the victim's statements at issue as testimonial in nature." *Id.* at *17.

This decision was not contrary to or an unreasonable application of clearly held federal law. The Sixth Amendment to the United States Constitution provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. A criminal defendant enjoys this right whether he is tried in federal or state court. *Crawford*, 541 U.S. at 42. The law, indeed, is clear that testimonial statements that are made for the truth of the matter asserted by witnesses absent from trial may be admitted at trial only if the declarant is unavailable and if the defendant had a prior opportunity to cross-examine him. *Id.* at 59. However, when non-testimonial statements are at issue, the Sixth Amendment simply does not apply, and the admission of the statements is governed by the state hearsay rules. *Id.* at 68.

To be considered "testimonial," the evidence generally must "involve[] out-of-court statements having the primary purpose of accusing a targeted individual of engaging in criminal conduct and . . . involve[] formalized statements such as affidavits, depositions, prior testimony, or confessions." *Williams v. Illinois*, 567 U.S. ----, 132 S. Ct. 2221, 2242 (2012); *see also Crawford*, 541 U.S. at 68. Run-of-the-mill hearsay typically is not "testimonial" in nature.

The Tennessee Court of Criminal Appeals reasonably applied *Crawford* in the petitioner's case to find that the victim's statements (or non-verbal behavior) were not testimonial and therefore did not implicate the Sixth Amendment. Its decision did not involve an unreasonable determination of the facts in light of the evidence, because the statements did not accuse the petitioner of engaging in criminal conduct or even mention his name, and the purpose of the statements clearly was not to accuse the petitioner of engaging in criminal conduct. Moreover, the statements were not formalized or made during a hearing, trial, or police interrogation. The petitioner is not entitled to relief on the basis of this claim.

### 4. Claim 16: Violation of due process by admission of hearsay testimony of statements by deceased co-conspirator Chuck Dixon

In his direct appeal, the petitioner argued both that the trial court erred in admitting certain hearsay statements by Chuck Dixon under the co-conspirator exception and that the statements were barred by the Supreme Court's interpretation of the Confrontation Clause in *Crawford*. As suggested above, a claim that a trial court erroneously admitted hearsay into evidence is governed by the state hearsay rules, *Crawford*, 541 U.S. at 68, and generally does not implicate federal constitutional rights. In this case, the Tennessee Court of Criminal Appeals first rejected the claim of error based on the admission of hearsay under state law. It reviewed the evidence of record to conclude that the state had established by a preponderance of the evidence that the petitioner and Chuck Dixon were "engaged in a conspiracy to manipulate the Cashbox charts for their personal gain," and that the statements at issue were "made in the course of and furtherance of that conspiracy." *D'Antonio*, 2005 WL 2874657, at *19.

Regarding the claim that the statements at issue violated the Confrontation Clause, the court concluded, that, like the hearsay statements by the victim, the statements at issue were not testimonial in nature and therefore not subject to *Crawford*. Again, this decision did not involve an unreasonable determination of the facts in light of the evidence in the record or an unreasonable application of clearly established federal law to those facts.

Other than invoking the Confrontation Clause, the petitioner has not indicated how the allegedly erroneous admission of hearsay testimony violated his federal constitutional rights. The petitioner is not entitled to relief on the basis of this claim.

**VI.    CONCLUSION**

For the reasons set forth herein, Mr. D'Antonio's petition under § 2254 will be denied and this matter dismissed with prejudice.

The Court must issue or deny a certificate of appealability ("COA") when it enters a final order adverse to a § 2254 petitioner. Rule 11, Rules Gov'g § 2254 Cases. The petitioner may not take an appeal unless a district or circuit judge issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner "has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the COA must "indicate which specific issue or issues satisfy the [required] showing . . . ." 28 U.S.C. § 2253(c)(3). A "substantial showing" is made when the petitioner demonstrates that "'reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further."'" *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "[A] COA does not require a showing that the appeal will succeed." *Miller-El*, 537 U.S. at 337. Courts should not issue a COA as a matter of course. *Id.*

In this case, only four of the petitioner's twenty-seven claims were fully exhausted and therefore reviewable on the merits. The petitioner failed to show any error of constitutional dimension in the state court's resolution of those claims, however. The other twenty-three claims are procedurally defaulted, and the petitioner is unable to establish the cause and prejudice necessary to overcome the procedural default. Because an appeal by the petitioner on any of the issues raised in his petition would not merit further attention, the Court will deny a COA. The petitioner may, however, seek a COA directly from the Sixth Circuit Court of Appeals. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order is filed herewith.

Kevin H. Sharp
United States District Judge